UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>VESTTOO LTD., *et al.*,<br><br>          Debtors.[1] | Chapter 11<br><br>Case No. 23-11160 (MFW)<br><br>Jointly Administered |
| LAWRENCE R. HIRSH, in his capacity as Liquidating Trustee of the Vesttoo Creditors Liquidating Trust,<br><br>          Plaintiff,<br><br>      v.<br><br>MCKINSEY & COMPANY and MCKINSEY & COMPANY, INC. ISRAEL,<br><br>          Defendants. | Adversary Proceeding<br><br> No. _____ |

## **COMPLAINT**

Plaintiff Lawrence R. Hirsh, in his capacity as Liquidating Trustee of the Vesttoo Creditors Liquidating Trust (the "Trustee"), by and through undersigned counsel, submits the following Complaint against Defendants McKinsey & Company and McKinsey & Company, Inc. Israel (collectively, "McKinsey") seeking: (1) damages for McKinsey's breach of contract; (2) damages for McKinsey's gross negligence in performance of its role as professional advisor; (3) the avoidance and recovery of preferential transfers received by McKinsey during the ninety (90) days prior to the commencement of the above-captioned Bankruptcy Cases; (4) the avoidance and recovery of constructive fraudulent transfers received by McKinsey during the two (2) years prior

---

[1] Due to the large number of debtor entities in the chapter 11 cases (collectively, the "Bankruptcy Cases"), a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/vesttoo.

1

to the commencement of the above-captioned Bankruptcy Cases; and (5) disallowance of McKinsey's claims in the above-captioned Bankruptcy Cases pursuant to 11 U.S.C. § 502(d).

## INTRODUCTION

1.  Vesttoo Ltd. (collectively with the affiliated chapter 11 Debtors, "Vesttoo" or the "Debtors") was an insurance technology startup company that sought to connect capital markets investors with reinsurance transactions to provide an alternative to traditional reinsurance companies.  Vesttoo's business collapsed in July 2023 after public disclosure that certain key outside reinsurance investors, including Yu Po Holdings, Limited ("Yu Po"), Hujie Holdings ("Hujie"), and Cheng Yuan Holdings ("Cheng Yuan"), colluded with certain rogue Vesttoo employees to provide fraudulent or otherwise unauthorized letters of credit ("LOCs") to collateralize reinsurance transactions arranged through Vesttoo.  Based on relationships with employees of China Construction Bank ("CCB") and later Standard Chartered Bank ("SCB"), those bad actors within Vesttoo delivered billions of dollars in unenforceable LOCs to unwitting purchasers of reinsurance, looted transaction revenue, and employed various fraudulent devices to conceal their misconduct from Vesttoo's board of directors and employees.

2.  For nearly a full year leading up to this collapse, McKinsey served as Vesttoo's self-described "wingman," earning millions of dollars in fees and providing credibility to Vesttoo's business in the eyes of Vesttoo's own board and the broader marketplace.  The agreements entered into by Vesttoo and McKinsey, which included a "Collaboration Agreement" detailing the close partnership between the parties, contemplated McKinsey's involvement in Vesttoo's business and investor development, growth strategy, risk management, and compliance functions.  Senior McKinsey employees embedded themselves with Vesttoo's leadership, promising to evaluate current and potential investor targets, identify risks to Vesttoo, generate business cases for

2

increased growth, and partner with Vesttoo to achieve "[i]ndustry-leading risk and compliance capabilities" that would allow Vesttoo to grow its business.

3.      But McKinsey never seriously undertook to fulfill any of these promises.  Instead, blinded by millions of dollars in fees and the promise of Vesttoo's future growth (McKinsey's fee structure included synthetic equity payouts and milestone awards), McKinsey conducted only a cursory review of Vesttoo's primary investor Yu Po, a largely unknown Chinese entity without any public presence that was supposedly providing billions of dollars of reinsurance capital.  Nor did McKinsey conduct any analysis of new investors onboarded during McKinsey's tenure, including Hujie and Cheng Yuan, bad actors aligned with Yu Po.  Despite McKinsey's deep expertise and professed commitment to helping its clients address "gaps across all dimensions of risk management,"[2] it turned a blind eye to the extraordinary risk and compliance failures that allowed only a single non-officer employee of Vesttoo to monopolize and manage exclusively Vesttoo's relationships with these critical investors.

4.      Moreover, McKinsey worked hand-in-glove with the few Vesttoo employees involved in the LOC scheme, who used their positions within the company to screen the misconduct from the rest of the organization.  McKinsey vouched for Yu Po and extolled the bona fides of Hujie and Cheng Yuan to Vesttoo's innocent officers and directors.  McKinsey had no good faith basis to believe these falsehoods and, given its industry knowledge and professional expertise, knew or should have known that the bad actors were deliberately keeping their colleagues in the dark.  Upon information and belief, McKinsey was motivated to unquestioningly push this narrative to ensure continued support for McKinsey's profitable arrangement with Vesttoo.  Much like the Vesttoo bad actors, McKinsey disregarded its legal duties to Vesttoo for

---

[2] *See* https://www.mckinsey.com/capabilities/risk-and-resilience/how-we-help-clients.

personal gain.  McKinsey's complicity enabled the bad actors to avoid detection while injuries to Vesttoo and its clients mounted.

5.      During McKinsey's tenure and with McKinsey's encouragement and imprimatur, Vesttoo entered into hundreds of millions of dollars of new reinsurance transactions, relying on purported capital from Yu Po, which ultimately resulted in enormous losses to insurance companies that believed they were ceding risk to reinsurance cells collateralized by enforceable LOCs.  By accepting millions of dollars in fees while taking no meaningful action to evaluate Vesttoo's investor base or address the extraordinary risk and compliance failures, McKinsey utterly failed to fulfill its fundamental role as management consultant and to comply with the terms of the parties' agreements.  McKinsey compounded these failures by contributing to the misinformation campaign that allowed these risks to escape detection.  This failure to provide competent services rose to the level of gross negligence.

6.      In the end, McKinsey was the "wingman" to one of the largest and most brazen insurance frauds in corporate history, resulting in billions of dollars in phony LOCs purportedly supporting Vesttoo reinsurance transactions.

7.      McKinsey's performance failures constitute a breach of its contractual duties to Vesttoo and gross negligence in the performance of its role of a professional management consultant.  As a result, McKinsey is liable for Vesttoo's resulting injuries.

8.      The Trustee also is entitled to avoid and recover the fees paid to McKinsey within the two (2) years prior to Vesttoo's Bankruptcy Cases as constructively fraudulent transfers pursuant to 11 U.S.C. § 548 and 550.  These fees, which total $3,706,949, were transferred to McKinsey while Vesttoo was insolvent or undercapitalized, and for less than reasonably equivalent value.  Vesttoo was insolvent at the time these payments were made because it was obligated to

satisfy hundreds of millions of dollars in losses relating to reinsurance transactions collateralized by unenforceable LOCs.

9.      The Trustee also is entitled to avoid and recover the fees paid to McKinsey within the ninety (90) days prior to the filing of Vesttoo's bankruptcy petitions as avoidable preferences pursuant to 11 U.S.C. § 547 and 550, which totaled more than $1.2 million.

10.      Finally, the Trustee seeks to disallow any claims in favor of McKinsey under 11 U.S.C. § 502(d) because McKinsey has not turned over to the Trust the transfers that are avoidable and recoverable under 11 U.S.C. § 550.

## THE PARTIES

11.      On the Effective Date of the Plan, which occurred on April 11, 2024, the Trust was vested with all claims and causes of actions of Vesttoo, including the claims asserted in this Complaint.  The Trust is empowered under the Plan "to commence, prosecute, and resolve any Liquidating Trust claims."  Dkt. 763-1 at 69-70.  Lawrence R. Hirsh is the Liquidating Trustee of the Trust.

12.      Defendant McKinsey & Company is a New York corporation with its principal place of business in New York, New York.  McKinsey & Company is a global management consulting firm with capabilities in business building, risk and resilience, strategy and corporate finance, and many others.  It has offices in more than 130 cities in over 65 countries throughout the world.

13.      Defendant McKinsey & Company, Inc. Israel is incorporated in Delaware and located in Tel Aviv, Israel.  It is one of several offices that McKinsey & Company maintains and operates internationally.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.  This adversary proceeding arises in or is related to the Bankruptcy Cases, which are cases under title 11.

15.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (F), and (O).

16.     This adversary proceeding is commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because it seeks, among other things, to recover money or property belonging to the Debtors' chapter 11 estates.  Fed. R. Bankr. P. 7001(a).

17.     As defined under the Plan, this adversary proceeding constitutes an Estate Cause of Action assertable by the Trustee and for which the Bankruptcy Court has expressly retained jurisdiction.  *See* Plan, Art. I(A)(75).

18.     Pursuant to Federal Rule of Bankruptcy Procedure 7008 and Local Bankruptcy Rule 7008-1, the Trustee consents to this Court's entry of final orders or judgments with regard to any claim in this adversary proceeding.

19.     Venue is proper in this district under 28 U.S.C. § 1409 and is consistent with the interests of justice, judicial economy, and fairness.

## FACTUAL ALLEGATIONS

### Vesttoo's Business and Early Growth

20.     Vesttoo was founded in 2018 with the goal of increasing capital markets investor participation in reinsurance markets.  In a typical Vesttoo transaction, an insurer or reinsurer would cede risk to an entity known as a "transformer," oftentimes structured as a segregated cell of a Bermuda segregated accounts company, that would convert the reinsurance risk into an equity interest in the transformer entity.  Vesttoo formed certain limited partnership entities—with outside

investors such as Yu Po serving as limited partner—that would acquire the equity interests in the transformer in exchange for agreeing to assume the risk of loss and pay any reinsurance claims against the transformer, thus providing reinsurance capacity for the underlying insurance transactions. To secure the reinsurance obligation, Vesttoo's limited partner investors would typically be required to post collateral in the form of LOCs drawn on a bank or other financial institution, which would be available to cover any reinsurance claims that exceeded amounts held at the transformer.

21. In August 2021, Vesttoo CEO Yaniv Bertele engaged Udi Ginati as a "finder." In this role, Ginati was to seek out and secure capital markets investors to invest in reinsurance securitized through Vesttoo. In return, Ginati received options from the collateral he secured for Vesttoo as well as a share of the company's revenues.

22. Ginati, who was subsequently appointed to a role as Senior Director of Capital Markets at Vesttoo, introduced Yu Po to Vesttoo as a supposed client of CCB that was interested in investment opportunities.

23. Ginati began working with individuals at Yu Po and CCB, along with certain other co-conspirators, to provide unenforceable collateral documents (including unauthorized LOCs) to purportedly fulfill Vesttoo's collateral obligations. Ginati was permitted to manage Vesttoo's relationship with Yu Po exclusively and without any oversight by other Vesttoo employees or managers. When well-intentioned Vesttoo employees expressed concern about the concentration of and lack of visibility into Vesttoo's capital structure, Bertele used his influence and authority to quash dissent and stymie diligence efforts. In June 2022, for example, Vesttoo employees Gaurav Wadhwa and David Schonbrun raised concerns about "the substance of [Vesttoo's] major investor Yu Po" including lack of "substantive KYC [know your customer] or AML [anti-money

laundering] checks." Bertele shut down this questioning, insisting that "Conducting due diligence on a client and deliberately looping out the sales person [*i.e.*, Ginati] is not only commercially unacceptable but also totally disregarding the person's feelings and humiliating." Left unchallenged, by November of 2021, Ginati and Yu Po began instructing Vesttoo to remit payments of amounts supposedly due to Yu Po, totaling millions of dollars, to bank accounts held in the names of several fictitious entities at different bank accounts in the United States. These amounts were not earned or owing given Yu Po's failure to provide enforceable LOCs. Upon information and belief, these amounts ultimately lined the pockets of Ginati and his co-conspirators.

24.     Soon after its first investment in a Vesttoo transaction in fall 2021, Yu Po became Vesttoo's single largest investor in reinsurance transactions. Yu Po invested in 71 transactions through Vesttoo (including 57 transactions involving CCB LOCs), which transactions involved Yu Po posting a total of roughly $3.1 billion in illusory capital, $2.81 billion of it in fraudulent CCB LOCs. The value of all transactions closed by Vesttoo since 2020 totaled $3.932 billion; 79% of this total ($3.1 billion) were placed with Yu Po and nearly all of the remaining 21% were placed with Vesttoo's other Chinese investors, Hujie and Cheng Yuan.

25.     The vast majority of the LOCs supporting these transactions were fraudulent or otherwise unenforceable. Vesttoo remained liable for this shortfall—for an amount in excess of $3 billion—pursuant to its obligations to satisfy the underlying ceded insurance obligations. Vesttoo did not and does not have sufficient assets to satisfy these liabilities.

### McKinsey's Involvement

26.     McKinsey became involved with Vesttoo in 2022 through the outreach of a mutual contact at the behest of Vesttoo CEO Bertele. After familiarizing itself with Vesttoo and

recognizing its perceived growth potential, McKinsey pitched and Vesttoo agreed to a close partnership beginning in the fall of that year. The parties ultimately executed three engagement agreements: (i) a Consulting Agreement dated October 31, 2022, between Vesttoo and McKinsey & Company, Inc. Israel "and its affiliates"; (ii) a January 10, 2023, Bridge Agreement to continue consulting services while the parties finalized a long-term Collaboration Agreement; and (iii) an 18-month Collaboration Agreement made effective as of January 9, 2023 (the "Collaboration Agreement," and collectively with the prior agreements, the "Agreements").

27. As memorialized in the parties' Collaboration Agreement, McKinsey's partnership with Vesttoo was all encompassing. McKinsey committed to provide Vesttoo access "to the full McKinsey network of global experts," and the teams employed for the engagement reflected that commitment. McKinsey's "partnership team" was led by Daniel Aminetzah, Senior Partner in New York, who McKinsey described as having "significant experience serving scale up companies on strategy, growth and operating model topics." Other members of the partnership team included personnel from Canada, Switzerland, and Israel. The internal groups created to govern the engagement also consisted of individuals from throughout the McKinsey organization. The "Pulse Check" review board met on a quarterly basis to review the progress of the engagement and agree on relevant milestones. Similarly, the "SteerCo" steering committee met bi-weekly to drive the engagement and track McKinsey's progress. Aminetzah served on the Pulse Check board and the SteerCo committee. Michael Park, also a Senior Partner in New York, served on the SteerCo committee. These groups also included McKinsey members based in Switzerland, Canada, and Israel.

28. In exchange for a mix of fixed fees and the possibility of equity and awards based on achievement of certain key performance indicators, McKinsey agreed to help Vesttoo diversify

9

its seller-side (cedents) and buyer-side (investors) business partners, and, more broadly, to serve as Vesttoo's "wingman" in pursuing these goals and "to remain flexible and agile in a true partnership mindset to make Vesttoo successful."  Senior McKinsey representatives embedded themselves at Vesttoo's offices for months at a time, working closely with Bertele.

29.    Touting Vesttoo's success "writing a new chapter in insurance history—made of transparency, collaboration, agility, and innovation," and with the promise of "enabl[ing] Vesttoo to achieve its aspirations earlier and with lower risk," McKinsey highlighted risk management and compliance as the first priority in its overview of the parties' partnership:

> 1) Industry-leading risk and compliance capabilities with a fully regulated Vesttoo in all priorities geographies
> 2) IPO-ready platform, including key processes, infrastructure, and talent
> 3) E2E marketplace up and running with live transactions and at the center of the Vesttoo story
> 4) No concentration risk on investor side and onboarding of the first Tier 1 investor
> 5) Meeting financial targets (topline and EBITDA) – current targets to be refined after strategy exercise
> 6) Diversified cedents' base incl. Life and new geos outside of US

30.    From the start of its engagement, McKinsey was aware that a primary challenge animating Vesttoo's willingness to pay McKinsey millions in consultant fees was to diversify Vesttoo's reinsurance investor base.  This was made more difficult by Vesttoo's dependence on Yu Po, a Chinese investor with no public presence that was providing billions of dollars in capital for Vesttoo reinsurance transactions.  McKinsey recognized that attracting new institutional investors would be more challenging because the incumbent investment was dominated by a single largely unknown firm without any established track record.  Despite this extraordinary concentration of risk that jeopardized further investment, McKinsey never met or interviewed Yu Po, never exercised professional judgment or drew upon its industry experience to consider whether Yu Po could plausibly access billions of dollars in LOC availability from a single financial

institution, never meaningfully inquired into the bona fides of Yu Po or its capital sources, and never expressed risk or compliance concerns about the unusual fact that Ginati was the sole Vesttoo employee permitted to communicate with Yu Po.

31.     Indeed, one of McKinsey's stated goals when initiating the partnership was to conduct 10-15 "'Voice-of-the-investor' interviews with current Vesttoo investors to understand i) reasons to participate in the Vesttoo platform and ii) key challenges / risks to be mitigated to help mainstream investing with Vesttoo."  But McKinsey did not follow through on this commitment and made no effort to interview Yu Po, by far the most significant source of Vesttoo's capital.

32.     Several weeks later, Yaniv Lushinsky—the McKinsey partner responsible for managing the Vesttoo relationship—asked if any "know-your-customer" or "KYC" diligence had been performed on Vesttoo's "Chinese investor."  A Vesttoo employee responded, providing a report of "the first KYC profile we initiated [which] was for our current Chinese investor and [which] process has been completed."  This report was initiated and completed less than two months before and consisted of a one-line response from a purported third-party insurance manager, Artex Risk Solutions, stating only that KYC was complete.  Vesttoo employees may have lacked the sophistication to perceive the inadequacies in such a report, or they may have been forbidden by Bertele from further inquiry.  McKinsey, on the other hand, with its deep risk-management expertise and professed commitment to maintaining "an independent perspective,"[3] should have recognized the existential risk and advised Vesttoo accordingly.  McKinsey failed to do so.

33.     Without considering how an unknown Chinese investor without any discernible public presence or market profile could safely provide billions of dollars in reinsurance collateral,

---

[3] *See* https://www.mckinsey.com/about-us/overview/our-purpose-mission-and-values.

McKinsey, blinded by the prospect of millions in consulting fees, made no further inquiry into Vesttoo's critical investment partner.  Instead, over the subsequent year, McKinsey continued to give presentations to cedents and make pitches to potential investors touting Vesttoo's platform and vouching for its business.  McKinsey also permitted and encouraged Vesttoo to use its affiliation with McKinsey to credential Vesttoo to the insurance market.  Meanwhile, Vesttoo entered into new reinsurance transactions involving hundreds of millions of dollars in risk in which Yu Po was purportedly providing collateral in the form of CCB LOCs.  On information and belief, Lushinsky provided explicit reassurance to Vesttoo officers by vouching for Yu Po's legitimacy, all without conducting any review of the relationship or Yu Po's bona fides.

34.    McKinsey failed to evaluate the Yu Po relationship even though it was Yu Po's suspicious and unverified character that prevented McKinsey from accomplishing its defined mission of diversifying Vesttoo's investor-side business.  Vesttoo did not onboard any new investors for more than six months after its partnership with McKinsey began.  And McKinsey knew that its repeated failures were caused by an absence of meaningful due diligence into Yu Po.  Both investors and cedents expressed concern directly to McKinsey personnel about the lack of insight into Vesttoo's existing sources of capital and collateral management.  Yet McKinsey made no meaningful effort to address these defects, apparently content to earn millions in fees while Vesttoo failed to make the progress McKinsey had agreed to facilitate.

35.    Tellingly, the *only* new capital investors recruited during McKinsey and Vesttoo's partnership—two additional Chinese investors and a second Chinese bank—were onboarded in April 2023 by Ginati, the same Vesttoo non-officer employee who dominated the Yu Po relationship.  McKinsey did not vet these entities or make any inquiry into their provenance.  McKinsey nonetheless prepared a detailed presentation for the Vesttoo board discussing the

onboarding as a "game changer" in terms of investment diversification, expanding the investor base from a single Chinese investor to three Chinese investors.

36.      As McKinsey touted its supposed onboarding success story, information regarding the Vesttoo fraud began to come to light. A major reinsurance claim by a cedent in the summer of 2023 resulted in one of the LOCs being called and then revealed to be fraudulent. In mid-July 2023, as pressure and scrutiny mounted, McKinsey and Vesttoo terminated their engagement.

Vesttoo Bankruptcy

37.      Vesttoo filed for relief under chapter 11 of the United States Bankruptcy Code on August 14-15, 2023 (the "Petition Date").

38.      The Court confirmed Vesttoo's liquidation plan on February 29, 2024, and Lawrence R. Hirsh was appointed as Liquidating Trustee of the Trust when the Plan went effective on April 11, 2024.

39.      Under the Plan, all causes of action of Vesttoo not released were vested in the Trust.

Consulting Fee Payments

40.      Pursuant to the parties' Agreements, Vesttoo paid McKinsey lump sums of $737,100 in January 2023, and $473,850 in March 2023. On May 1, 15, and 30, 2023, respectively, Vesttoo made three separate payments to McKinsey of $1,247,999, $624,000, and $624,000.

41.      In total, Vesttoo paid McKinsey $3,706,949 during this period.

42.      Of the $3,706,949 total, $1,248,000 was paid within the ninety (90) days prior to the Petition Date.

43.      When these transfers were made, Vesttoo was insolvent and undercapitalized because it was obligated to satisfy hundreds of millions of dollars in losses relating to reinsurance transactions collateralized by unenforceable LOCs.

44.    The fees charged by McKinsey were excessive when compared to the amounts that comparable startup companies pay for consulting services and the value provided by McKinsey in exchange.[4]

### CAUSES OF ACTION

### COUNT 1
### (Breach of Contract)

45.    The Trustee incorporates the allegations of the foregoing paragraphs as if set forth fully herein.

46.    The Agreements constitute valid and binding contracts between Vesttoo and McKinsey.

47.    Under the Agreements, McKinsey agreed, *inter alia*, to conduct due diligence into investors, including risk evaluation, and to partner with Vesttoo on compliance and risk management.

48.    Vesttoo paid McKinsey millions of dollars in fees to fulfill these obligations under the Agreements.

49.    McKinsey breached its material obligations under the Agreements by, among other things: (i) failing to provide any meaningful diligence or risk evaluation with respect to Vesttoo's largely unknown sole investor, Yu Po, or Vesttoo's subsequently identified additional investors, Hujie and Cheng Yuan, that were onboarded during McKinsey's tenure; (ii) failing to partner with Vesttoo to provide risk and compliance services, particularly with respect to management of

---

[4] *See, e.g.,* The Insurer, Vesttoo Board Reviewing McKinsey Relationship as it Holds Back Payment (Aug 8, 2023), https://www.theinsurer.com/news/vesttoo-board-reviewing-mckinsey-relationship-as-it-holds-back-payment/ ("[M]ultiple sources were struck by McKinsey's decision to work with the start-up, given that the firm largely leans towards consulting for Fortune 1000 companies . . . . Sources also found it equally surprising a start-up with Vesttoo's profile would contract for such a high fees-advisory arrangement.").

Vesttoo's relationships with its investors, which were dominated exclusively by a single non-officer employee in a manner inconsistent with any recognized compliance framework; and (iii) providing representations to Vesttoo's employees, board of directors, customers, and investors regarding the legitimacy of Vesttoo's business, investor base, and bona fides without undertaking any good faith evaluation of these fundamental matters and having reason to believe that Vesttoo's business may have been compromised.

50.    Vesttoo suffered significant losses as a result of McKinsey's failure to comply with the Agreements.

51.    The Trustee is entitled to damages for McKinsey's breach.

## COUNT 2
### (Gross Negligence)

52.    The Trustee incorporates the allegations of the foregoing paragraphs as if set forth fully herein.

53.    McKinsey markets itself as a global leader in strategic consulting.  McKinsey agreed to partner with Vesttoo and serve as its "wingman" to, among other things, conduct risk evaluation with respect to Vesttoo's capital investors and prioritize development of compliance and risk management functions.

54.    Vesttoo retained and paid McKinsey millions of dollars for McKinsey's expertise in professional consulting and risk management.  Vesttoo and its employees justifiably depended upon McKinsey to provide reliable advice based on the diligence and evaluation work within the scope of McKinsey's engagement.

55.    It was both foreseeable to and actually foreseen by McKinsey that the possible illegitimacy of Vesttoo's hyper-concentrated reinsurance investment business posed an existential risk to the company.  McKinsey perceived a significant probability that Yu Po would cause

Vesttoo's collapse, given that, among other things, no meaningful due diligence had ever been performed on Yu Po, Vesttoo's relationship with Yu Po was managed exclusively by Ginati, Yu Po lacked the track record that an investor capable of investing billions of dollars in the reinsurance business of a single startup should have, and other investors and cedents expressed to McKinsey their concerns about Yu Po's potential illegitimacy.

56.    Because of McKinsey's sophistication, close partnership with Vesttoo's management, and high-level role in the company's decision making, McKinsey fairly and reasonably owed a duty of care to Vesttoo with respect to the foreseeable and existential risks posed by Vesttoo's near-total reliance on Yu Po.  This duty entailed, at a minimum, an obligation to advise Vesttoo's management of the need to perform substantive due diligence on Yu Po and the risks involved in not conducting that due diligence.

57.    McKinsey breached this duty and was grossly negligent by failing to take *any* action to address these risks or advise Vesttoo of their severity.  McKinsey compounded this breach by, among other things: (i) disingenuously reassuring Vesttoo's officers regarding Yu Po's legitimacy; (ii) misleading Vesttoo's board as to the legitimacy of Hujie and Cheng Yuan, though those investors shared Yu Po's vaporous characteristics; and (iii) supplying false information to cedents contemplating participation in Vesttoo's reinsurance transactions.  McKinsey's reckless disregard of such clear and catastrophic risks constituted a gross deviation from the duty of care that McKinsey's status and role demanded.

58.    Vesttoo suffered significant losses as a result of McKinsey's gross negligence and gross incompetence.

59.    The Trustee is entitled to damages for McKinsey's wrongful conduct and gross negligence.

## COUNT 3
### (Avoidance and Recovery of Fraudulent Transfers)

60.     The Trustee incorporates the allegations of the foregoing paragraphs as if set forth fully herein.

61.     Within two years prior to the Petition Date, Vesttoo made transfers to McKinsey in the total amount of $3,706,949 (the "Transfers").

62.     Vesttoo was insolvent at the time that the Transfers were made because, among other reasons, it was obligated to satisfy hundreds of millions of dollars in losses relating to reinsurance transactions collateralized by unenforceable LOCs.

63.     At the time of each of the Transfers, Vesttoo was engaged, or about to engage, in business or a transaction for which any property remaining with Vesttoo was unreasonably small capital.

64.     Vesttoo received less than reasonably equivalent value in exchange for the Transfers because, among other reasons, McKinsey failed to provide the services promised under the Agreements.  McKinsey's failure was of such a nature and degree that it constituted a gross deviation from the standard of conduct and competence that a reasonable management consulting company would have observed in the situation.

65.     Additionally, the fees charged and paid to McKinsey were excessive compared to the typical amounts that startup companies pay for consulting services.

66.     Accordingly, the Trustee is entitled to an order under 11 U.S.C. § 548 and § 550 of the Bankruptcy Code avoiding the Transfers and awarding the Trustee a recovery of an amount equal to the Transfers plus pre-judgment and post-judgment interest thereon to the date of payment.

## COUNT 4
### (Avoidance and Recovery of Preferential Transfers)

67.     The Trustee incorporates the allegations of the foregoing paragraphs as if set forth fully herein.

68.     Pursuant to the parties' Agreements, McKinsey was obligated to provide consulting and other professional services to Vesttoo during 2022 and 2023.   Vesttoo was obligated to pay certain fees to McKinsey under the parties' Agreements.

69.     McKinsey received payments from Vesttoo in the total amount of $1,248,000 (the "Preference Payments") within ninety (90) days prior to Vesttoo's Petition Date.

70.     Each of the Preference Payments constituted a transfer of an interest in property of Vesttoo.

71.     McKinsey was a creditor of Vesttoo at the time of each of the Preference Payments by virtue of Vesttoo's payment obligations under the parties' Agreements.

72.     Each payment was to or for the benefit of a creditor within the meaning of section 547(b)(1) of the Bankruptcy Code because each payment was made on account of an antecedent debt then owed by Vesttoo to McKinsey.

73.     Vesttoo was insolvent at the time that the Preference Payments were made because it was obligated to satisfy hundreds of millions of dollars in losses relating to reinsurance transactions collateralized by unenforceable LOCs.   Vesttoo is entitled to a presumption of insolvency for each of the Preference Payments pursuant to 11 U.S.C. § 547(f).

74.     As a result of the payments Vesttoo made to McKinsey, McKinsey received more than it would have received if: (i) Vesttoo's bankruptcy case were a case under chapter 7; (ii) the payments had not been made; and (iii) McKinsey received payment to the extent provided by the provisions of the Bankruptcy Code.

75.     Prior to initiating this adversary proceeding, the Trustee sent McKinsey a demand letter which invited McKinsey to advise the Trustee of its defenses, to which McKinsey responded. The Trustee considered the defenses outlined in McKinsey's response when evaluating and ultimately determining to pursue its causes of action in this matter.

76.     Accordingly, the Trustee is entitled to an order under 11 U.S.C. § 547 and § 550 of the Bankruptcy Code avoiding the Preference Payments and awarding the Trustee a recovery of an amount equal to the Preference Payments plus pre-judgment and post-judgment interest thereon to the date of payment.

### COUNT 5
### (Disallowance of all Claims)

77.     The Trustee incorporates the allegations of the foregoing paragraphs as if set forth fully herein.

78.     McKinsey is the transferee of a transfer avoidable pursuant to 11 U.S.C. §§ 547 and 548, which property is recoverable from McKinsey under 11 U.S.C. § 550.

79.     McKinsey has not paid the amount of the Preference Payments or the Transfer(s), or turned over such property, for which McKinsey is liable.

80.     Pursuant to 11 U.S.C. 502(d), any claims in favor of McKinsey in Vesttoo's Bankruptcy Cases must be disallowed until such time as McKinsey returns amounts equal to the aggregate amount of the Transfers, plus interest thereon and costs.

### **PRAYER FOR RELIEF**

**WHEREFORE**, the Trustee prays for the following relief:

1.      Damages in an amount to be determined at trial, plus interest, and reasonable attorneys' fees and costs incurred;

2.    Avoidance and recovery of $3,706,949 as fraudulent transfers under 11 U.S.C. § 548 and

550;

3.    Avoidance and recovery of $1,248,000 as avoidable preferences under 11 U.S.C. § 547

and 550;

4.    Disallowing any claims in favor of McKinsey under 11 U.S.C. § 502(d);

5.    Awarding to the Trustee the cost of suit incurred herein, including pre-judgment interest;

and

6.    Such other and further relief as the Court deems appropriate.

Dated:  August 13, 2025                    Respectfully submitted,
        Wilmington, Delaware


                                           */s/ Karen C. Bifferato*
                                           **CONNOLLY GALLAGHER LLP**
                                           Karen C. Bifferato (#3279)
                                           1201 North Market Street, 20th Floor
                                           Wilmington, DE 19801
                                           T: (302) 757-7300
                                           F: (302) 757-7300
                                           E: kbifferato@connollygallagher.com

                                           and

                                           **MCGUIREWOODS LLP**
                                           Dion W. Hayes
                                           Aaron G. McCollough
                                           Christopher N. Thatch
                                           Joshua Q. Jamieson
                                           Gateway Plaza
                                           800 East Canal Street
                                           Richmond, VA 23219
                                           T: (804) 775-1000
                                           F: (804) 775-1061
                                           E: dhayes@mcguirewoods.com
                                           E: amccollough@mcguirewoods.com
                                           E: cthatch@mcguirewoods.com
                                           E: jjamieson@mcguirewoods.com

                                           *Counsel for Plaintiff Lawrence R. Hirsh, in his
                                           capacity as Liquidating Trustee of the Vesttoo
                                           Creditors Liquidating Trust*